# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MARCUS JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 14-00024-KD-B |
| ) | |
| CORPORAL CHUCK MILLINER, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment filed by defendant Chuck Milliner, plaintiff Marcus Johnson's response in opposition, and defendant's reply (docs. 26-29, 33-34, 37). Upon consideration, and for the reasons set forth herein, the Motion for Summary Judgment is DENIED.

I. Background

Plaintiff Marcus Johnson brings this civil action alleging that he was denied his constitutional rights while incarcerated in the Mobile Metro Jail. Johnson alleges that defendant Corporal Chuck Milliner (Milliner), for no justifiable reason, tasered him in the eye and chest while he was standing on the stairs in the Jail. Johnson alleges that he was rendered unconscious by the tasing, fell down the stairs, fractured his skull and lost sight in his eye.

In Count One, brought pursuant to 42 U.S.C. § 1983, Johnson alleges that Milliner used excessive force and violated his Fourteenth Amendment Due Process rights to be free from cruel and unusual punishment. In Count Two, brought pursuant to state law, Johnson alleges that Milliner committed an assault and battery upon him. Johnson invokes this Court's supplemental jurisdiction over his state law claim.

II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

III. <u>Facts</u>[1]

The parties do not dispute that at all relevant times, Johnson was a pre-trial detainee incarcerated in the Mobile Metro Jail, that Milliner was employed as a Corrections Corporal at the Jail who had been assigned as the Pod Officer for the pod that included the wedge where Johnson was held, and that Susan Combs was employed as the Floor Officer for Johnson's wedge.

---

[1] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [Johnson] the nonmoving party." *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). However, Johnson's version of the events and the facts on summary judgment "may not turn out to be the actual facts if the case goes to trial." *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir.1996).

The parties do not dispute that Milliner fired the taser at Johnson while he was standing on the stairwell to the second level of the wedge. One prong hit Johnson in the left mid-epigastrum and the other hit his left eye. Although there is some discrepancy as to whether Johnson fell from the top of the stairs or from the middle, he fell from the stairs to the floor and was injured by both the taser prongs and his fall. He received head injuries, injury to his eye, and a broken tooth. He now has residual migraines and permanent vision loss in his left eye. Johnson required medical treatment and was hospitalized for a week. He had one more hospitalization for migraines.

There is no dispute of fact that Milliner was trained on the use of a taser and had knowledge of the Sheriff's Department's Standard Operating Procedures (SOP) for use of a taser and use of force. Milliner was also aware of the Department's SOP's for placement and duties of its officers in the pod and wedge and the procedure when they left their respective positions.

After the tasering incident, Milliner completed a use of force incident report and Lieutenant Veronica Wilcox investigated the incident. Wilcox submitted a report to Deputy Warden Robert Houston who recommended to Warden Noah Oliver that a pre-disciplinary hearing be held. At the hearing before the pre-disciplinary committee, Milliner was found guilty of conduct unbecoming an employee in the public service on basis that he "changed assignments with another Corrections Officer without permission."

Milliner also plead guilty to the charge of conduct unbecoming an employee in the public service on basis that he "failed to notify the Security Supervisor that [he] predicted a problem with an inmate" and "entered the wedge alone and had a confrontation with an inmate" in violation of the SOP. The SOP instructs officers to call for security if they

4

anticipate a problem and not confront an inmate alone.

Milliner also plead guilty to the charge of neglect of duty on basis that he "tased an inmate while he was standing on the stairs causing serious injury to the inmate" in violation of the SOP. The committee based its decision on Milliner's narrative and statements, Officer Combs narrative, and Lieutenant Wilcox's report. (Doc. 33-9) Milliner received a notice of disciplinary action and was suspended for a period of time and underwent additional training. (Doc. 33-10)

The disputed facts surround the use of force when Johnson attempted to get a food tray. For purpose of this motion for summary judgment, the Court will summarize the undisputed facts and conflicting versions of the facts, which are relevant to this event and relevant to the Court's decision. *See Madura v. City of North Miami Beach, Florida*, 517 Fed. Appx. 847 (11th Cir. 2013) (finding that the "specific details about the events differ substantially … according to the parties' testimony", providing a "side-by-side comparison of their accounts" and reversing and remanding the district court's grant of summary judgment on basis that it improperly gave greater weight to the officer's testimony when ruling on motions).

Standard procedure for serving meals to the inmates followed this pattern: When the trays arrived on the cart, the inmates entered their cells and Combs secured the cell doors. The trays would be placed on the table in the dayroom and when Combs was sure that there was a tray for each inmate present, she opened the cell doors and the inmates came out to get their trays. Combs as the Floor Office monitored the inmates during their meal. Milliner as the Pod Officer remained in the pod. (Doc. 29-1, p. 8-9, Combs deposition)

On the day of the incident, Combs testified that when the trays arrived, the inmates went into their cells but Johnson's cell door did not lock. Combs took the trays into the

5

dayroom and told the inmates that she was going to open the doors and then gave them the "normal little spiel" but told Johnson, "you've already been fed, don't step down." (Doc. 29-1, p. 14) Johnson pushed his cell door open, came out on the balcony and replied: "I'm getting a damn tray." (*Id*., p. 19). The inmate who had delivered the trays was holding the door open to the wedge, Milliner stepped in, asked Combs to step out and told her to go to the pod, which she did. Combs gave Milliner the Taser and he told her that he would finish feeding the inmates. (*Id*., p. 14)

When Milliner stepped in to the wedge, Combs heard him tell Johnson not to come down because he had been fed. (*Id*., p. 19-20)[2] Milliner alleges that Johnson was coming down the stairs and responded that he was getting a "damn tray". (*Id*., p. 19-20) Milliner alleges that he then told Johnson that he had a taser and Johnson replied that he didn't "give a damn about the taser". (Doc. 29-1, p. 20-21)[3] The inmate who had brought the trays had been holding the door open to the wedge, but he then closed the door and Combs could not hear the rest of the verbal exchange but she could see Johnson from the pod. Also, during this time, Milliner had opened the cell doors and some of the inmates had come out to get their trays. (*Id.*) When Johnson reached the third or fourth step from the bottom, Combs heard Milliner "holler Stop". (*Id.*) Johnson stepped down again, and Milliner again "hollered Stop", then Milliner fired the taser. (*Id.*) Milliner testified that he aimed the taser at the center of Johnson's body. (Doc. 29-2, p. 28) Milliner also alleges that he did not remove the taser prong from Johnson's eye and

---

[2] Milliner alleges that when Johnson was brought to the wedge from the Docket Room, the Intake Officer told Milliner that Johnson had eaten a bag lunch while in the Docket Room. (Doc. 29-2, p. 14, Milliner Deposition) Johnson alleges that when he arrived at the wedge he let Combs and Milliner know that he had not eaten in docket. (Doc. 33-2, Inmate Reginald Lee's Statement)

[3] Milliner's allegations regarding the verbal exchange with Johnson was based on Combs' testimony at deposition.

6

that the prong was still there when the medics arrived (doc. 33-13, Exh. 13, Milliner Depo. p. 94).

Milliner alleges that he switched places with Combs because he believed that his presence would de-escalate the situation. Milliner thought that because of his size, gender, and the taser warning, Johnson would not cause a disturbance and would comply with their orders to return to his cell. (Doc. 29-2, p. 20-21, Milliner deposition)

Johnson alleges that Milliner entered the wedge with the taser drawn and activated with the laser beam visible. (Doc. 33-2, Lee statement) He also alleges that when Milliner came in, he looked like he was ready to tase someone and had something to prove. (*Id*.) Johnson alleges that Milliner never came any farther into the wedge than right next to the entry door and behind the red line drawn inside the door and beyond which the inmates were not to proceed. (*Id*. p, 14)

Johnson testified that after he was told that he could not get a tray because he had already eaten, he asked Milliner, "Well, can you go get your sergeant for me, or could you go get your supervisor, because I ain't ate nothing?" (Doc. 33-1, p. 8, Johnson deposition) Johnson said again that he had not eaten. Milliner replied that he "ain't fixing to go get nobody", to which Johnson repeated, "Could you please just go get your supervisor for me because I ain't ate nothing." Milliner responded, "I ain't fixing to go get nobody. Just don't come down here and mess with these trays." Johnson asked again, "Could you please go get your supervisor for me, I ain't ate nothing." (Doc. 33-1, p. 9-10) Johnson alleges that he (Johnson) did not appear irate, did not make any threats, and did not show any form of aggression. (Doc. 33-2, p. 2, Lee statement) Johnson also alleges that neither Milliner nor Combs told him to return to his cell. (Doc. 33-1, p. 23) At this point, the second landing inmates had come down and no one was

7

left on the balcony or stairs but Johnson. (*Id*., p. 10)

Johnson alleges that Milliner then told him that if he took another step, he would be tased. Johnson lifted his "feet up", and Milliner shot him with the taser. (Doc. 33, p. 11) Johnson alleges that he was not moving toward Milliner but shifting his weight. (*Id*., p. 20). Johnson had one foot on the stair and the other in the air when he was shot. (*Id.*, p. 11) He fell unconscious to the concrete floor and when he awoke, he heard a woman scream "why [did] you do that?" and then Milliner said "stay where you at, don't move." After, that he was placed in a wheelchair and taken for treatment. (*Id*., at 15) Johnson alleges that Milliner aimed the taser at his head and that the laser light beam was on his forehead. (Doc. 33-2, p. 2, Lee statement) Johnson also alleges that Milliner removed the taser prong from his eye. (*Id.,* p. 3) The nurse practitioner's notes indicate that the prong was not attached when the she arrived (doc. 35-1, Amended Exh. 3 ("Second lead reportedly hit his left eye; dangling at PT's side on our arrival"). The nurse practitioner removed the other prong from Johnson's mid-epigastrum. (*Id.*) Lieutenant Veronica Wilcox who responded to the incident, testified that the prong was not in Johnson's eye when she arrived (doc. 33-4, Exh. 4, Wilcox Depo. p. 51).

Johnson alleges that Milliner admitted that Johnson had not made any threats to Combs or Milliner. (Doc. 33-13, p. 24) Milliner also admitted that he did not feel that Johnson was combative but thought he was "mouthy" and "was telling the other inmates: I'm gonna get me a tray." (*Id*. at 21) Milliner did not dispute that female floor officers could satisfactorily lock down an inmate if they needed to. (*Id*. at 24) Johnson alleges that Milliner admitted that he went into the pod to make a show of force because he sensed trouble coming. (*Id*. at 21-22)[4]

---

[4] Milliner testified that he felt like he "could handle the situation without it escalating to the use of force. If a man sees a guy weighing 250 pounds with a taser in his hand turn towards

Johnson alleges that Combs first interacted with him when he asked for a mat. She told him that she would get him a mat, if he would wait until they were through feeding. Johnson said yes and went upstairs to his cell. (Doc. 33-12, p. 17, Combs' deposition) Johnson alleges that Combs had not felt concerned about staying in the Wedge and had not needed Milliner to walk into the Wedge "to protect her", that she felt capable of handling herself, and that hearing inmates "get mouthy" was a "standard, daily thing." (*Id.* at 27-28, 37, 32-33). Johnson alleges that Combs testified that Milliner knew that she could hold her own and she had no intention in letting Johnson have a tray. (*Id* at 29-30).

Johnson alleges that Lieutenant Wilcox indicated in her report that she "did not find where the inmate ever posed a threat to Cpl. Miller, and that he has been trained that if a confrontation is inevitable, to remove himself from the situation and call for backup." (Doc 33-5, Wilcox report).

IV. Analysis

A. Johnson's § 1983 claim of excessive force

Johnson brings Count One, pursuant to 42 U.S.C. § 1983, alleging that Milliner used excessive force in violation of the Fourteenth Amendment. Johnson alleges that Milliner violated his constitutional rights by tasing him when Johnson moved his foot on the step and said "I just want to eat something" (doc. 1, p. 3) Johnson alleges that he did not move toward Milliner after Milliner told him not to take another step. (*Id.*)

On motion for summary judgment, Milliner argues that he is entitled to qualified immunity because Johnson has failed to show that Milliner's use of force constituted excessive

---

him, any common man or reasonable man would say, hey, this guy is not playing." (Doc. 33-13, p. 24)

force. Milliner argues that "[i]n the absence of evidence that Cpl. Milliner acted maliciously and sadistically, his use of force does not shock the conscience, and thus, he did not violate Johnson's Fourteenth Amendment." (Doc. 27, p. 11)

"The Due Process Clause of the Fourteenth Amendment protects pretrial detainees, like [Johnson], from the use of force that 'shocks the conscience,' which is force that is applied 'maliciously and sadistically for the very purpose of causing harm.'" *Skelly v. Okaloosa County Board of County Commissioners,* 456 Fed. Appx. 845, 847–848 (11th Cir.2012) (quoting *Danley v. Allen*, 540 F.3d 1298, 1306–1307 (11th Cir.2008), overruled on other grounds by *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009). "Under the doctrine of qualified immunity, if [Milliner] establishes that he was acting within the scope of his discretionary authority when the alleged excessive force occurred, the burden shifts to [Johnson] to show that [Milliner] is not entitled to qualified immunity." *Skelly*, 456 Fed. Appx. at 847 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1136–37 (11th Cir.2007). "To defeat qualified immunity, [Johnson] must show both that a constitutional violation occurred and that the constitutional right violated was clearly established." *Id.* (citing *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir.2009). " In Eighth and Fourteenth Amendment excessive force cases, however, 'the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution....'" *Id*. (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321–22 (11th Cir.2002) and *Danley,* 540 F.3d at 1310) (footnote omitted) (bracketed text in original).

"In Eighth and Fourteenth Amendment excessive force cases, the 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm.'" *Id*. at 847-848 (citation omitted). "Because the applicable standard is the same for both Eighth and Fourteenth Amendment excessive force claims, courts apply Eighth Amendment case law to cases involving pretrial detainees." *Id*. at 848, n.1 (citing *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir.2005)).

"In determining whether the force was applied maliciously and sadistically to cause harm, courts consider several factors, including: 'a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response.'" *Id.* (citing *Fennell*, 559 F.3d at 1217.

In this action, the core judicial inquiry is whether Milliner tased Johnson in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. The court must "consider these factors 'as reasonably perceived by' [Milliner] based on the facts known to him at the time and 'give a wide range of deference to prison officials acting to preserve discipline and security.'" *Skelly,* 456 Fed. Appx. at 848. "Nonetheless, deference to correctional officers is not absolute and does not insulate from review actions taken in bad faith or for no legitimate purpose." *Id*. (citing *Ort v. White*, 813 F.2d 318, 322 (11th Cir.1987)).

The Court finds that genuine issues of material fact exist as to whether the force was applied maliciously and sadistically to cause harm. Specifically whether there was a need for force and, if force was necessary, whether the amount of force applied exceeded what was necessary. There is no dispute of fact that Johnson did not threaten Milliner or Combs. Milliner asserts that the issue is not limited to whether Johnson threatened him, but instead whether Johnson's non-compliance with Combs' and Milliner's orders to stay in his cell and

his insistence that he was going to get a food tray, arguably taking it from another inmate since no tray had been brought for him, could have lead to a disturbance. In support, Milliner alleges that both he and Combs told Johnson to stay in his cell, but Johnson alleges that neither officer gave this order.

Johnson testified that he asked Milliner three times to get a supervisor because he had not eaten, but he was not irate or aggressive, and did not make any threats. Johnson also alleges that Milliner had other options in that he could have stepped out of the wedge and called for security, as evidenced by the fact that his decision not to do so, resulted in disciplinary actions against him. Johnson also argues that Milliner interjected himself into the situation in an effort to teach Johnson a lesson but not in good faith to maintain or restore discipline because Combs did not feel threatened and had dealt with similar situations on many other occasions.

Under Johnson's version of the facts and viewing those facts in the light most favorable to him, a reasonable jury could conclude that the force was not applied in a good faith effort to preserve discipline and security. Accordingly, Milliner's motion for summary judgment based on qualified immunity is denied.

### B. Johnson's state law claim for assault and battery

Johnson brings a state law claim for assault and battery against Milliner. Johnson alleges that the same set of facts that support his claim that Milliner's use of force was excessive and unconstitutional, also support his claim for assault and battery. He also alleges that Milliner was acting beyond the discretion permitted by his office.

On motion for summary judgment, Milliner argues that he is entitled to immunity under Ala. Code § 14-6-1, which extends the immunity granted to a sheriff to the employees acting

for and under the direction and supervision of the sheriff, and under Ala. Code § 36-22-3, which states that persons undertaking duties of the sheriff for and under the direction and supervision of the sheriff shall be entitled to the same immunities and legal protection as the sheriff. Both statutes qualify the immunity by stating that it is available so long as the person was acting within the line and scope of their duties and acting in compliance with the law.

The parties do not dispute that Milliner was employed by the Sheriff and acted under his direction and supervision. However, Johnson responds that this Court must interpret the plain language of these statutes as written. In that regard, Johnson argues that Milliner was not acting within the scope of his duties and was not acting in compliance with the law when he tased Johnson and caused his injuries.

Milliner also argues that he is entitled to common law immunity upon application of the factors set forth in *Ex parte Cranman,* 792 So. 2d 392 (Ala. 2000) because he did not act maliciously. Under Alabama law, municipal police officers, such as Milliner are "peace officers" and entitled to discretionary-function immunity from tort liability as set forth below: :

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, ... and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, *and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.*

Ala. Code § 6–5–338(a) (1975) (italics added).

In *Cranman,* the Alabama Supreme Court restated the rule governing state-agent immunity, as follows:

13

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
>> (1) formulating plans, policies, or designs; or
>>
>> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>>
>>> (a) making administrative adjudications;
>>> (b) allocating resources;
>>> (c) negotiating contracts;
>>> (d) hiring, firing, transferring, assigning, or supervising personnel; or
>>
>> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>>
>> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>>
>> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Cranman*, 792 So.2d at 405.

The *Cranman* factors were subsequently modified in *Hollis v. City of Brighton*, 950 So.2d 300 (Ala.2006) to specifically include the statutory discretionary-function immunity given to peace officers. Subparagraph (4) now reads as follows:

> (4) exercising judgment in the enforcement of criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975.

*Hollis*, 950 So. 2d at 309.

Milliner as the defendant claiming entitlement to discretionary-function immunity must

satisfy three elements of proof: (i) that he was a peace officer on the date of the incident in question, (ii) and that he was performing law enforcement duties, and (iii) exercising judgment or discretion when doing so. *See Howard v. City of Atmore*, 887 So.2d 201, 204 (Ala. 2003); *Walker v. City of Huntsville*, 62 So.3d 474, 496–98 (Ala. 2010). Milliner has met this initial burden because the undisputed evidence supports each of these elements. The burden then shifts to Johnson to show that one of the two Cranman exceptions to immunity apply. *Ex parte Kennedy*, 992 So.2d 1276, 1282 (Ala. 2008). The factors are set forth as follows:

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
> > (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
> >
> > (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So.2d at 405.

Johnson argues that Milliner has lost his immunity from tort liability because he has acted maliciously and beyond his authority.[5] Johnson asserts that establishing the alleged violation of the Fourteenth Amendment would satisfy the *Cranman* exceptions to discretionary-function immunity.

The statutory immunity in Ala. Code § 14-6-1 and Ala. Code § 36-22-3 does not extend

---

[5] The Court notes that Milliner was disciplined and found to have violated the SOP for use of restraint and force and the SOP for rules of conduct. Viewing the evidence in the light most favorable to Johnson, Deputy Warden Houston testified that a correctional officer should never remove a prong from an inmate, and Inmate Lee stated that he saw Milliner remove the prong from Johnson's eye.

15

to the circumstance where the person employed by the Sheriff was not acting within the line and scope of their duties and was not acting in compliance with the law. The discretionary-function immunity excludes from its application, the circumstance where the peace officer acts willfully, intentionally, maliciously, in bad faith or beyond their authority. Because the Court has determined that a genuine issue of material fact exists as to whether Milliner has violated Johnson's constitutional rights under the Fourteenth Amendment, a decision which ultimately will turn on the core inquiry of whether Milliner applied force in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm, Milliner's motion for summary judgment as to the state law claim for assault and battery is denied. [6]

V. Conclusion

In accordance with the foregoing, Milliner's motion for summary judgment is DENIED.

**DONE** this the 4th day of November 2014.

                                  s/ Kristi K. DuBose
                                  KRISTI K. DuBOSE
                                  UNITED STATES DISTRICT JUDGE

---

[6] Milliner concedes as much. In his reply, he argues that "If Milliner's actions were not a violation of Plaintiff's Fourteenth Amendment rights then he is entitled to statutory immunity because he would [ ] have been acting within the line and scope of his duties and would not have violated any laws[.]" (Doc. 37, p. 8)